# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VANESSA LOGAN, | ) |
| Plaintiff, | ) |
| v. | ) Case No: 10 C 5051 |
| | ) Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Vanessa Logan, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Ms. Logan asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Logan applied for DIB on February 24, 2005, alleging that she had become disabled on February 15, 2005 – she later changed that to November 18, 2005. (Administrative Record ("R.") 12, 941). Her application was denied initially and upon reconsideration. (R. 73-77, 64-67). Ms. Logan continued pursuit of her claim by filing a timely request for hearing.

An administrative law judge ("ALJ") convened a hearing on September 8, 2008, at which Ms. Logan, represented by counsel, appeared and testified. (R. 937-1006). In addition, Dr. Hugh Savage testified as a medical expert and Thomas Dunleavy testified

as a vocational expert. (R. 29, 62-72). On February 2, 2009, the ALJ issued a decision finding that Ms. Logan was not disabled because she retained the capacity to perform jobs that exist in significant numbers in the national economy. (R. 9-25). This became the final decision of the Commissioner when the Appeals Council denied Ms. Logan's request for review of the decision on June 18, 2010. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Logan has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Logan was born on May 27, 1970, making her thirty-eight years old at the time of the ALJ's decision. (R. 945).

### B.
### Medical Evidence

Ms. Logan has a host of medical problems and has sought and received a great deal of treatment. Consequently, the medical record in this case is a leviathan 1000-page volume, presented in a jumble of documents in no particular order. But, the parties rely on just a small percentage of those documents to support their positions. In March of 2008, a treating physician mentions that she had mild asthma. (R.729). Medical notes in 2008 indicate that she suffers from non-insulin dependent diabetes, which was diagnosed in 2006 or 2007. (R.506, 584, 729, 732). Records cited by Ms. Logan show that her diabetes appears to be asymptomatic; her sugar levels are generally good. (R. 730). But, in February 2008, Ms. Logan saw Dr. Hadsaitong for diabetes management (Tr. 558-61).

She had some numbness in her toes, but the examination was otherwise normal. (Tr. 560). Dr. Hadsaitong diagnosed her with diabetes "not optimally controlled," and adjusted her medications (Tr. 560-61). In March 2008, she was prescribed amitriptyline (an anti-depressant) for possible lower extremity diabetic neuropathy (Tr. 729). In April, her doctor restricted her from "strenuous activity" and lifting more than 5 pounds. (R. 723).

In November of 2005, she underwent neurosurgery to decompress a Chiari malformation. (R. 326, 340, 342, 506). In July 2006, she had a normal brain CT scan. (R. 367, 369). In August 2006, Dr. Getch saw Ms. Logan for follow-up. He referred her to pain management; and opined that she remained adequately asymptomatic post-brain surgery. (Tr. 433-36).

Ms. Logan's height – 5'9" – and weight – 240 to 247 pounds – are mentioned on three occasions: October 2007 (R. 543), February 2008 (R. 558,560), and May 2008 (R. 568). Dr. Getch recommended she lose weight in June 2006. (R 433-36). And Dr. Hadsaitong noted she was obese at a diabetes evaluation in February 2008. (R. 561).

In July 2005, Ms. Logan received an injection in her heel to relieve a bout of plantar fasciitis (R. 251). Medical notes repeatedly indicate that Ms. Logan suffers from systemic lupus erythematosus (SLE). (R. 329,500,532,574,588,594), which had been diagnosed in 1999. (R. 594). In June 2005, Ms. Logan's lupus "appear[ed] to be under good control." (Tr. 219). As of February 2008, Ms. Logan was not taking any medication for SLE. (Tr. 560).

Ms. Logan has also sought treatment for recurrent migraines in April and May 2008 (R. 568, 569, 762). The pain was sharp, constant and there were no palliating factors. (R. 573). Nerve blocks and physical therapy were prescribed. (R. 571).

After a verbal altercation with her husband in June 2006, Ms. Logan attempted an overdose of Vicodin. (R. 207-240). She was diagnosed with depression, responded to treatment with Cymbalta, and was asymptomatic when discharged after three-night stay. (R. 207). In October 2007, Ms. Logan reported she had a history of depression, but none at that time. (Tr. 543-46).

The bulk of the medical evidence in this case seems to be concentrated on her fibromyalgia and her back impairment. Dr. Slack stated that Ms. Logan had been diagnosed with fibromyalgia in 1996, well before her alleged onset of disability. (R. 506). In March and April 2006, Logan complained of knee pain, but X-rays and exams were normal. (Tr. 260-61). She did not attend physical therapy because she was too busy with school (Tr. 257-58). In June 2008, either Dr. Berkowitz or Dr. Skosey[1], who examined Ms. Logan on three occasions, filled out a form regarding Ms. Logan's condition at the request of her attorney. (R. 501). He reported that Ms. Logan's fibromyalgia resulted in multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, anxiety, and depression. (R. 501). Pain was generalized throughout her body. (R. 502). Dr. Berkowitz said he was unable to evaluate whether the impairment affected Ms. Logan's concentration or her ability to tolerate work stress. (R. 502). He had no idea how much she could lift or carry. (R. 504).

---

[1] The name is illegible; the reporting physician may well be Dr. Skosey, to whom Dr. Berkowitz had referred Ms. Logan. (R. 500, 505).

The doctor thought Ms. Logan could walk two blocks, sit for more than two hours at a time, and stand for 45 minutes at a time. (R. 502-03). In an eight-hour workday, Ms. Logan could sit for six hours and stand/walk for two. (R. 503). She would have to walk for five minutes every 90 minutes. (R. 503). She would need two 5-10 minute breaks each day. (R. 503). Dr. Berkowitz didn't know whether she'd miss any work due to her impairment, but she would have good days and bad days. (R. 504). In March of 2006, Dr. Westin noted fibromyalgia, which was apparently focused in her knees. Nevertheless, she had an excellent range of motion. He described her condition as chronic low-grade inflammation with significant weakness in the knees. (R. 532).

Ms. Logan also suffers from degenerative disc disease/degenerative joint disease (R. 267) with minimal spondylosis. (R. 349). An August 2004 examination revealed pain in the neck during range of motion study. Upper and lower extremity muscle strength were normal, reflexes were 2-3+, and sensation was intact. Hoffman's sign was negative. Ms. Logan walked with a slight right-sided limp. Her back flexion and extension were limited to 60 degrees by pain, and straight leg raising was positive bilaterally, more so on the right side (R. 267-69). In June of 2005, straight leg raising was positive on the right at 45 degrees. Muscle strength was 5/5 in lower extremities, and she had normal gait. Nerves were intact. (R. 218). A June 2006 EMG was normal on the right side where she claimed to experience pain, but abnormal on the left side. Accordingly, it was difficult to correlate her symptoms with the study results. (R. 252, 254, 255). An April 2006 MRI revealed disc dessication, bulging and herniation at L3-L4, but no nerve root compression; central bulge at L4-L5, but no nerve root compression; mild facet changes

and circumferential protrusion but no nerve root compression at L5-L6. (R. 254). A July 2007 MRI of her lower back showed "relatively mild" degenerative changes. (Tr. 690).

Physicians from the Agency reviewed Ms. Logan's medical record on two occasions. On September 30, 2004, Dr. Jimenez found she could lift 20 pounds, carry 10, stand or walk for two hours out of an eight hour day – with a cane – and sit for six. (R. 166-173). On March 19, 2007, Dr. Gotanco found Ms. Logan could lift 20 pounds and carry 10, stand or walk for 6 hours each day without any assistive device, and sit for 6 hours as well. (R. 489-496).

Ms. Logan is taking or has taken a laundry list of medications, including Gabitril, Glypizide, Metformin, Byetta shots, Norco, Relafen, Zocor, Cytalopram (R,961-962); Amitriptyline, Plaquenil. (R,963).

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At the hearing, Ms. Logan testified that she lived in a house with her husband and their nine-year-old child; two other children were away at college. (R. 946). She drives to work, church, and to the grocery store. (R. 947). She works as a receptionist/secretary at Chicago State in the work study program. She worked 4 to 5 hours a day, 15 to 20 hours per week. (R. 949). Her supervisor accommodated her – she allowed her to work more when she felt better, and was lenient about her missing work – 2-3 days a month or more – due to her condition. (R. 950).

Previously, she worked as a property manager. Her most recent position ended when she was injured on the job – she fell and hurt her left leg. (R. 953). She sued the

6

company and ended up with a settlement. (R. 953). Before that, she was in property management with the CHA, but left that position when the area became too violent. (R. 955). As a result of her Chiari malformation, she suffered severe migraines for a period of about 3 or 4 months. She had to get injections to quell the pain. She was forced to drop several classes. (R. 943). After the decompression surgery, the migraines lessened in severity, but she continues having them. (R. 956).

Ms. Logan said that for her diabetes, she took a shot and medicine. (R. 957). She said she had some tingling and numbness in her feet. (R. 957). Between that and her right-sided weakness, she used a cane to walk. (R. 957). She said she had lost 40 pounds. (R. 958). As a result of her lupus, her immune system was very weak, and she got sick frequently. (R. 958). She had trouble sleeping at night and took medicine to stay alert during the day. (R. 959). She had stiffness in the morning. It caused her to be late for work on occasion, but, again, they were flexible. (R. 969). She was unable to work eight hours at the job due to stiffness and extreme fatigue. (R. 970-71). Her professors were flexible as well; she was registered with the school's disability office. (R. 973).

Ms. Logan said she wasn't able to cook often – one or two days a week. Her son helped her with grocery shopping. (R. 959). She didn't do the dishes; her husband did the laundry. (R. 960). She could walk two blocks with her cane, but not even a half-block without it. (R. 960). She couldn't use public transit alone. (R. 961). She took Norco and Relafen for her pain. The medication made her drowsy. She tried Lyrica, but it made her too nauseated. (R. 961). About four times a year, she had to go to the emergency room for a shot for her pain. (R. 962). In addition to those two, she took

Zocor (high cholesterol), Gabitril, Glipizide (diabetes), Metformin (diabetes), Byetta injection (diabetes), Amitriptyline (depression or diabetic neuropathy), Celaxa (depression), Plaquenil (lupus), Advair (asthma), Atacon (high blood pressure). (R. 962-63)..

## 2.
## Medical Expert's Testimony

Dr. Hugh Savage testified as a medical expert. He listed Ms. Logan's documented impairments – asthma, diabetes, fibromyalgia, lupus, low back pain with lumbar radiculitis, and obesity, Chiari syndrome. He said that Ms. Logan was obese, but not morbidly obese. (R. 978). She had decompression surgery for the Chiari syndrome, but more recently had to have shots. Dr. Savage noted she was headache-free for three years after the procedure. (R. 979). MRI findings were "relatively benign" and she could walk two blocks in March 2008. (R. 980). While no cane was mentioned on that date, several other notes indicated Ms. Logan used a cane due to right side pain. (R. 980, 981).

Dr. Savage didn't think Ms. Logan's condition met or equaled a listing, but he did feel she was significantly functionally impaired. (R. 984). He also stated that she had experienced a decrease in her ability to function from September 2004, when a reviewing physician found her limited to work where she could sit 6 hours, stand 2 with a cane, lift 20 pounds and carry 10. (R. 467, 984-85). Dr. Savage thought she was now limited to sedentary work: lifting and carrying no more than 10 pounds, occasionally bending, squatting, crawling, climbing. (R. 986-87).

## 3.
## Vocational Expert's Testimony

Thomas Dunleavy then testified as a vocational expert. He classified Ms. Logan's property management positions as light work with transferable skills. (R. 1001). Those skills included, secretarial, data entry, and records management skills. (R.1001) 1002). He indicated that her work study job was not considered competitive employment; the jobs were only available to students with special circumstances. (R. 1002). Ms, Logan's transferable skills would allow her to perform sedentary jobs such as secretary (20,000 jobs in the regional economy) and receptionist (10,000). (R. 1002). If a person approached 12 absences a year, or was off task for more than 15% of the time, it would be a significant problem in such jobs. (R. 1003).

## D.
## ALJ's Decision

The ALJ found that Ms. Logan suffered from severe impairments, but did not specify what they were. (R. 15). He did go into a summary of the medical evidence relating to all her impairments. (R. 15-20). The ALJ next determined that she did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 20). He specifically found that her depression did not meet or equal the criteria for listing 12.04. (R. 20). He then referenced the testimony of the medical expert that Ms. Logan did not meet or equal a listing. The ALJ specifically noted that the doctor had indicated that her lupus did not meet listing 14.02. (R. 21). The ALJ went on to note that Ms. Logan's back and neck impairment did not include nerve root compression or stenosis. Her diabetes was not well-controlled as of February 2008, but she was non-compliant with her medication and diet, and numbness in her toes may have been due to

her back impairment. As for listing 4.00 for cardiac impairments, a May 2008 ECG showed no ischemia and an ejection fraction of 55%. The ALJ mentioned that fibromyalgia exams revealed multiple tender points but that her asthma was mild and did not meet listing 3.03. (R. 21).

The ALJ next decided that, despite her constellation of impairments, Ms. Logan could perform a full range of sedentary work. (R. 22-23). He felt that her impairments could produce the symptoms she alleged but not to a degree inconsistent with an ability to perform sedentary work. The ALJ based this finding on the testimony of the medical expert:

> The medical expert noted the hypertension is controlled (e.g., 124/82 on February 19,2008, per Exhibit 15F, pp. 21-24 ); she is obese but not morbidly so; she has mild asthma (Exhibit 15F, p. 120); she has diabetes mellitus type II; ANA[2] is positive with lupus diagnosed; she has degenerative joint disease (osteoarthritis) with low back pain without compression or herniation (normal gait per Exhibit 16F); per Exhibit 15F at March 31,2008 exam there was cervical pain at C5-C6 with no stenosis; she has Chiari syndrome with headaches which improved since 2005 but returned in March 2008 (Exhibit 16F); a stress test was a false positive (Exhibit 1OF) as mild to moderate, relatively benign and with a conclusion of no significant coronary artery disease;

(R. 22).

The ALJ then compared Ms. Logan's allegations with the medical record. He said that while she alleged fatigue, the neurological findings did not mention fatigue. Although she has a high SED, her other blood work is normal. The ALJ felt that ANA readings would be crucial, but there was no evidence of any weakness or end organ damage. While Ms. Logan alleged fibromyalgia with some trigger point tenderness, she

---

[2] White blood cells produce antibodies to fight infectious organisms in the body. White these antibodies mistakenly attack normal proteins found in cell nuclei, they are called antinuclear antibodies. They can lead to autoimmune diseases such as lupus. http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/ana.asp.

10

did not have debilitating pain at a significant number of trigger points (8 are recorded). She had a terrible time with the Chiari malformation, but she largely recovered from that illness until March 2008, when the headaches returned. The ALJ felt this scared her, but her headaches improved and there was no further evidence of that illness continuing. The headaches were treated with bilateral occipital blocks. The ALJ noted Ms. Logan's allegation of numbness in her feet, and lupus may weaken her immune system, there was no evidence of end organ damage. He added that, in February 2008, she was not on any medication for lupus. (R. 22-23).

The ALJ then discussed Ms. Logan's activities. He pointed out that she works, attends religious services, and goes to the grocery store. While she might not be able to do what she used to, the ALJ stated she was functional. Although she alleged right-sided weakness and uses a cane, that did not disqualify her from sedentary exertional activity. She left her job as a property manager for CHA because it was in a violent crime area, and not because of sickness. She suffered a back and leg injury on her job as property manager for the Habitat Company, was terminated, and received a settlement. The ALJ noted that the injuries were not related to diabetes, hypertension, fibromyalgia, asthma, lupus, depression, or Chiari malformation. (R. 23).

The ALJ explained that he was giving weight to the medical expert's opinion and to the tests set out in Exhibit 16F. He also gave weight to State agency findings from 2007. Overall, he said, the medical evidence showed improvement in her condition. (R. 23).

The ALJ then determined that Ms. Logan could not perform her past work in property management because it was light work. (R. 23). He noted that, at 38, Ms.

Logan was considered a younger individual under the regulations, and had acquired transferable work skills. (R. 23). Relying on the testimony of the vocational expert, the ALJ found that Ms. Logan could perform work that existed in significant numbers in the regional economy. (R. 24). The ALJ did not believe that Ms. Logan would miss a significant number of days of work due to the condition. He did not believe that she received special consideration for missing work in her part-time position, noted that her testimony indicated she could work more hours if she desired. The ALJ felt the medical record did not show she was limited to part-time work. (R. 24). He concluded that Ms. Logan was not disabled and not entitled to benefits under the Act. (R. 25).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the

court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544.

### B.
### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Ms. Logan submits that there are flaws in the ALJ's decision. First, she complains that the ALJ's analysis of whether her condition met the listings was inadequate. It is alleged that the ALJ failed to adequately consider her memory problems, hearing loss, and limitations in using her hands in her residual functional capacity ("RFC") determination. She also argues that the ALJ failed to take her somatoform and bipolar disorders into account. Then, she says the ALJ ignored portions of the VE's testimony. She also contends the ALJ improperly rejected the opinion of her social worker. Finally, she chastises the ALJ for not having had a medical expert review some evidence that came in after the hearing.

At step three, the ALJ found that Ms. Logan did not have an impairment or combination of impairments that met or equaled a listed impairment. A claimant is eligible for benefits if she has an impairment that meets or equals the criteria in an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant may also demonstrate under the listings by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* § 404.1526(a). In order to determine whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Here, Ms. Logan focuses on the ALJ's treatment of two listings, 12.04 covering depression, and 14.02B covering lupus.

The listing for lupus sets forth the following criteria:

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §14.02B.

The ALJ confined his analysis to constitutional symptoms or signs. He specifically found that Ms. Logan suffered from one of them, malaise (R. 22), and he correctly determined that she did not suffer from another: involuntary weight loss. The problem is that he disposed of the other two rather tersely:

> As to listing 14.02 there is nothing stated about fatigue in the March 31, 2008, extremely detailed exam, nor, I note, no [sic] mention of weight loss or fever required by the listing.

(R. 21). By concentrating on a single examination note in a 1000-page record, the ALJ ignored the fact that fevers come and go; Ms. Logan had good days and bad days. (R. 504). Her fatigue is the same type of symptom or sign. There are at least two other occasions – and likely more – where fatigue is specifically mentioned. (R. 478, 483).

Relying on a snapshot of Ms. Logan's condition on a single day is certainly a "perfunctory analysis of the listing." *Bauer*, 381 F.3d at 668. Perhaps, as the Commissioner suggests in his brief, the medical record does not document any instances of fever (*Defendant's Response*, at 9) – it does document instances of fatigue – but that's not what the ALJ said. He said the March 31, 2008 exam did not mention fever. And the court is restricted to reviewing the ALJ's decision, not the Commissioner's *post-hoc* rationale for it. *Mueller v. Astrue*, 493 Fed.Appx. 772, 776 (7th Cir. 2012); *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir.2010). Because the ALJ failed to properly support his finding that Ms. Logan did not suffer from fatigue or fevers, and he concluded she did suffer from malaise, his analysis of whether she meets listing 14.02B's criteria is flawed.

The second part of listing 14.02B is not unlike the second part of other listing Ms. Logan focuses on, listing 12.04. Listing 14.02B requires marked limitations in two areas of functioning, while listing 12.04B requires either that, or a marked limitation in one area along with repeated episodes of decompensation, each of extended duration. The ALJ explained that while Ms. Logan attempted suicide – an episode of decompensation – her breakdown was not of extended duration. (R. 20). But, as for the remaining areas of functioning, the ALJ provided no explanation for his findings. He simply concluded:

> In activities of daily living, the claimant had mild restriction. In social functioning, the claimant had no difficulties. With regard to concentration persistence or pace, the claimant had mild difficulties.

(R. 20). The ALJ fails to explain how he arrived at these conclusions.

The only mention the ALJ makes of Ms. Logan's social functioning or daily activities comes later in the opinion, where he indicates he disbelieves she suffers fatigue because she "works, attends religious services, and goes to the grocery store." (R. 22). But that's an inaccurate picture of what Ms. Logan does. She has a part-time job, and she cannot manage it on a regular basis. Her employer says as much, but makes special accommodations for her. (R. 498). Chicago State seems to be the textbook example of the indulgent or altruistic employer, and so the ALJ made too much of the fact that Ms. Logan "works." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003); *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998). Similarly, while Ms. Logan said she went to the grocery store, she explained that she didn't go without assistance. Moreover, she said she could only cook about one or two days a week. She didn't do the dishes. She didn't do the laundry. That's not much in the way of daily activities.

As for social functioning, it's unclear what the ALJ bases his finding that Ms. Logan has no restrictions on. Perhaps attending religious services? There's no way to tell because the ALJ does not say. The same can be said for concentration, persistence and pace.

It must be noted that these limitations might stem from a mental impairment or, as the ALJ felt regarding Ms. Logan's malaise – from physical impairments like lupus or fibromyalgia. But, as already indicated, limitations in functioning are considered under both the listing for depression and lupus. And, when determining whether a claimant

meets or equals a listing, an ALJ has to consider the combined effect of a claimant's impairments. *Arnold v. Barnhart*, 473 F.3d 816, 821 (7th Cir. 2007).

Based on all these considerations, the ALJ's failure to perform an adequate analysis at step three or adequately explain his rationale for his conclusions requires a remand, and the remainder of Ms. Logan's arguments need not be addressed. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011). But there are other shortcomings in the opinion, and the ALJ's credibility determination, which has already been touched on, warrants some discussion.

The ALJ found Ms. Logan's allegations of fatigue not credible because there was no mention of fatigue on March 31, 2008 and because she works, goes to church, and goes grocery shopping. As already explained, the ALJ put too much stock in Ms. Logan's part-time work, especially given the leniency of her employer regarding absences due to her illness. *Henderson*, 349 F.3d at 435; *Wilder*, 153 F.3d at 801; *see also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011)(limited hours and/or high absentee rate runs counter to ability to hold down full-time position). And, as also already explained, the ALJ ignored the limited nature of Ms. Logan's activities. She is unable to do certain chores and requires assistance with others. The ALJ was not at liberty to disregard these qualifications. *See Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000) (fact that claimant did housework with help from her husband did not undermine her allegations of disabling pain); *Day v. Astrue*, 334 Fed.Appx. 1, 8, 2009 WL 1137726, *6 (7th Cir. 2009)(criticizing ALJ's finding that claimant did household chores where claimant testified that he needed help from his sons to do them); *Groskreutz v. Barnhart*, 108 Fed.Appx. 412, 417, 2004 WL 1943249, *5 (7th Cir.

2004)(same). Even if Ms. Logan could do a few chores without assistance or walk a couple blocks without the use of a cane, that would not equate to an ability to sustain full-time employment. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir.2005).

The ALJ also seemed to doubt the effects of Ms. Logan's fibromyalgia – or maybe whether she had it at all – because she did not have "debilitating pain at a significant number of trigger points (8 are recorded)." (R. 23). It's not clear from the opinion what the ALJ is driving at, but the Commissioner explains in his brief that the rule of thumb for a diagnosis is that a patient must have at least 11 of 18 specified trigger points to be diagnosed as having fibromyalgia, citing *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).

As already noted, the Commissioner can't supply the reasoning for the ALJ's opinion. ALJ didn't reference any rule of thumb. Moreover, he didn't identify where in the record it was found that Ms. Logan fell short of the required trigger points for a diagnosis. At one point in his opinion, the ALJ once again harkens back to that day in March of 2008 when all was well – no trigger points were mentioned. (R. 21). But the flaw in that reasoning has already been discussed at length, and it does not appear that the doctor at that exam felt it necessary to perform a trigger-point examination. He notes: "Fibromyalgia – [diagnosed] in 1996 . . . Confirmed." Indeed, the diagnosis of fibromyalgia appears throughout the record and it was confirmed by the medical expert at the hearing. (R. 979). So, it remains unclear what the ALJ meant when he spoke of 8 trigger points and where he got it from.

In the end, this case is somewhat reminiscent of *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). There, the Seventh Circuit opined that:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.

532 F.3d at 609. Ms. Logan certainly has good days and bad. She suffers from a constellation of impairments and for them, takes a pharmacy full of medications. She does, however, work, or at least attempt to. She has a part-time job, which is sedentary in nature, but misses many days and relies on the largesse of her employer in that regard. Perhaps there is evidence to support the ALJ's decision that she can hold down a full time version of such a job, but he failed to construct a logical bridge between that evidence and his conclusion.

## V.
## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/1/13